Brenda Moody Whinery, Chief Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| UBALDO JUAREZ, | Case No. 0:17-bk-06277-BMW |
| Debtor. | **RULING AND ORDER REGARDING CHAPTER 11 PLAN CONFIRMATION** |

This matter came before the Court pursuant to the *Plan of Reorganization Dated January 17, 2018* (the "Plan") filed by Ubaldo Juarez (the "Debtor") on January 17, 2018 (TE C)[1]; the *Objection to Confirmation* (the "Objection") filed by Edgar Todeschi and Georgina Ponce (the "Creditors") on March 8, 2018 (Dkt. 88); and all pleadings related thereto. A trial was conducted on May 31, 2018 (the "Trial Date"), at which time the parties presented evidence and testimony was provided by the Debtor; Sean Allen, the branch manager of the Debtor's employer; and Leticia Arreola, the Debtor's long-time girlfriend. Post-trial briefs were filed by the parties on June 21, 2018 and June 22, 2018, at which time the Court took the matter under advisement. Based on the pleadings, testimony offered, exhibits entered into evidence, and the entire record before the Court, the Court now issues its ruling.

/ / /

/ / /

---

[1] References to exhibits that were admitted into evidence at trial are by exhibit number/letter and page or paragraph. For example, "TE A at 4" would refer to page 4 of trial exhibit A. "TE R at ¶ 6" would refer to numbered paragraph 6 of trial exhibit R.

## I.  Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(L). This is a contested matter governed by Federal Rule of Bankruptcy Procedure 9014, and the following constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to contested matters by Federal Rules of Bankruptcy Procedure 7052 and 9014(c).

## II.  Factual and Procedural Background

1.  The Debtor filed his voluntary petition under Chapter 11 of the Bankruptcy Code on June 6, 2017 (the "Petition Date").

2.  The Debtor asserts that two incidents necessitated the bankruptcy:  (i) the Debtor and Ms. Arreola filed incorrect joint tax returns for tax years 2009 through 2016, based upon the advice of his former accountant, and as a result, the Debtor was faced with a large tax liability; and (ii) the Debtor was faced with defending himself in costly litigation commenced by the Creditors in Yuma County Superior Court. (TE B at 4-5).

### A.  The Debtor's Assets

3.  The Debtor originally scheduled assets in the amount of $365,115.18. (TE A at 1), which assets include his residence in Yuma, a 2014 Jeep Wrangler, a 50% interest in a Magic Runabout (a boat), a 50% interest in a NAS boat trailer, a Carson flatbed trailer, and a Yamaha Wave Runner FX HO. (TE A at 4). A 2013 Toyota Venza, which is titled in the Debtor's name, but which his daughter drives and insures, was not included in the Debtor's schedules. (Trial Tr. 39:20-40:12; TE A at 4; TE 27).

4.  It is the Debtor's understanding that a federal tax lien encumbers all of his non-exempt assets. (TE R at ¶ 45).

5.  In his schedules, the Debtor also discloses his membership interest in two limited liability companies. The Debtor owns a 100% membership interest in 4th Avenue, LLC ("4th Avenue"), which he claims has no assets or operations, and a 90% membership interest in UBLA

Properties, LLC ("UBLA"). (TE R at ¶¶ 8-9). Ms. Arreola holds the remaining 10% membership interest in UBLA. (TE R at ¶ 9).

6.      UBLA was formed on the day before the Petition Date for the purpose of holding title to a vacant lot in Yuma (the "Vacant Lot"). (Trial Tr. 90:15-17, 139:20-140:1; TE R at ¶ 9). UBLA did not hold legal title to any real property as of the Petition Date. (*See* Trial Tr. 90:15-17; TE R at ¶ 9). No evidence was submitted as to the funding of UBLA.

7.      The Debtor initially scheduled UBLA as having no value, but on June 29, 2017, the Debtor amended his schedules to disclose UBLA's equitable interest in the Vacant Lot, which the Debtor valued at $35,000. (TE A at 50).

8.      On or about September 13, 2017, UBLA acquired a 50% legal interest in the Vacant Lot. (TE 10). The remaining 50% interest was conveyed to MGV Properties LLC for $30,000, which sum was deposited into UBLA's bank account. (TE 10; TE 14 at 7). UBLA still holds a 50% interest in the Vacant Lot. (Trial Tr. 123:13-19).

9.      On November 30, 2017, UBLA acquired a property located at 2050 South 9th Avenue, Yuma, Arizona. (TE 11). This property was sold to a third party on March 19, 2018. (Trial Tr. 99:15-22, 122:19-23; TE 13).

10.     In January 2018, the Debtor received a $10,000 distribution from UBLA, which he disclosed in his January 2018 monthly operating report. (Trial Tr. 121:16-122:6; TE L).

B.      The Debtor's Liabilities

11.     The Debtor scheduled liabilities in the amount of $673,749.77, of which $414,682.82 was scheduled as general unsecured debt. (TE A at 1).

12.     On December 14, 2017, the Creditors filed a general unsecured proof of claim in the amount of $261,390.40 for amounts due under a note executed by the Debtor on or about December 6, 2011, in the principal amount of $200,000, with interest accruing at the rate of 32.5% per annum. (Claim 7-1).

13.     The Debtor scheduled the Creditors' claim as disputed, but has not filed an objection to the Creditors' claim nor sought an estimation of the claim. (*See* TE A at 21).

14.     On September 14, 2017, the Creditors commenced an adversary proceeding (0:17-ap-00587-BMW), in which they seek a determination that their claim is non-dischargeable under Code § 523(a)(2)(A).[2]

C.     The Debtor's Employment and Relationship With Ms. Arreola

15.     The Debtor and Ms. Arreola have been in a personal relationship for approximately twenty-seven years. (Trial Tr. 56:19-57:7; JPT at 2; TE R at ¶ 5; TE S at ¶ 3). Although the Debtor and Ms. Arreola are not married, they have established a household and family together, and shared a joint bank account pre-petition. (*See* Trial Tr. 57:8-19, 76:21-25, 176:1-14).

16.     The Debtor and Ms. Arreola both work as licensed realtors. (JPT at 2; TE R at ¶ 3; TE S at ¶ 4). Pre-petition, the Debtor and Ms. Arreola worked for Realty Executives McConnaughay (Trial Tr. 49:2-8, 172:14-16). During this period of employment, Ms. Arreola worked as an assistant to the Debtor and as an independent real estate agent. (Trial Tr. 58:6-8, 149:16-18).

17.     While employed by Realty Executives McConnaughay, all commissions earned by the Debtor and Ms. Arreola were made payable to the Debtor and were deposited into the Debtor and Ms. Arreola's joint bank account. (Trial Tr. 148:8-17, 149:16-18). The couple entered into this arrangement so that Ms. Arreola could avoid paying certain fees and a percentage of her commissions to Realty Executives McConnaughay. (Trial Tr. 58:10-24). Under this arrangement, Ms. Arreola testified that she would identify the portion of the commissions she had earned and transfer that amount from the couple's joint account to her own personal accounts, leaving some amount in the joint account to cover joint expenses. (Trial Tr. 171:15-172:25, 177:1-8).

18.     It is not disputed that in the twenty-two months prior to the Petition Date, the total funds transferred from the couple's joint account to Ms. Arreola's personal accounts totaled approximately $72,425. (Trial Tr. 149:7-18; TE 17; TE 36; TE 37).

---

[2] Unless indicated otherwise, statutory citations herein refer to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

19.     Because the couple's commissions were made payable to the Debtor during the period that the couple was employed by Realty Executives McConnaughay, Ms. Arreola disclosed minimal income on her tax returns and is listed as a dependent on the Debtor's amended tax returns for a number of years. (Trial Tr. 54:13-21, 55:23-25, 184:20-23; TE 22 at 5; TE 23 at 2; TE 24 at 15).

20.     The Debtor and Ms. Arreola stopped working for Realty Executives McConnaughay approximately four months before the Petition Date, at which time the Debtor began working with Realty Executives through its Phoenix office. (Trial Tr. 49:2-11, 59:17-23). As an independent contractor for Realty Executives, the Debtor manages a team of approximately four to five members, including Ms. Arreola. (TE R at ¶ 6; TE S at ¶ 4; TE T at ¶ 6).

21.     As the leader of a Realty Executives team, distributions of commissions among the members of the Debtor's team are primarily at the Debtor's discretion. (Trial Tr. 129:12-19).

22.     When the Debtor and Ms. Arreola work together on a listing, any resulting commission is divided between the two based on the amount of work each contributed, the policy of Realty Executives, and general industry practice. (TE R at ¶ 6; TE S at ¶ 4).

23.     Through Realty Executives, the Debtor and Ms. Arreola receive separate paychecks. (Trial Tr. 149:19-21).

24.     Ms. Arreola is listed as a dependent on the Debtor's bankruptcy schedules. (TE A at 28).

25.     The Debtor testified that to the extent he had sales pending or escrows open on the Petition Date, he did not list any accounts receivable on his schedules on the basis that he is not entitled to a commission until a sale closes. (Trial Tr. 29:1-14, 138:17-139:3). The Debtor testified that he has deposited all commissions received post-petition into his debtor-in-possession account. (Trial Tr. 138:5-16).

/ / /

/ / /

D.    The Debtor's Income and Expenses

26.    Pre-petition and during the pendency of this case, the Debtor has earned his income through his representation of buyers and sellers of real property, and through his investments in real property. (TE B at ¶ 2.1).

27.    According to the testimony of Mr. Allen, the Debtor has performed better than average and has received recognition from Realty Executives for outstanding productivity. (TE T at ¶¶ 7, 9).

28.    The Debtor focuses on a segment of the Yuma real estate market that remains relatively stable and reliable during the summer months. (Trial Tr. 133:7-14; TE T at ¶ 10). Additionally, industry reports predict that Yuma real property market values will appreciate 2% to 5% annually. (Trial Tr. 134:12-21; TE T at ¶ 12).

29.    According to the budget and the pro forma projections attached to the Debtor's disclosure statement, the Debtor's income averages $17,080 per month, the Debtor's business expenses average $8,600 per month, and the Debtor's personal expenses average $5,037.59 per month. (TE B at 46-47). Thus, based on the budget and pro forma projections distributed to creditors, the Debtor had net monthly income in the amount of $3,442.41.

30.    The Debtor testified that these income and expense amounts were inflated, and were calculated based on income he earned and expenses he incurred when he worked for Realty Executives McConnaughay. (Trial Tr. 48:23-49:24).

31.    After the contested confirmation hearing, the Debtor filed the following income and expense charts:

    i.    Comparative Chart re Income and Expenses as evidenced by Debtor's Monthly Operating Reports (TE E-O):

| Monthly Operating Reports | Exhibit | Income | Expenses | Disposable Income |
|---|---|---|---|---|
| June 2017 | E | $6,963.94 | $6,758.24 | **$205.70** |
| July 2017 | F | $2,230.94 | $3,862.23 | **-$1,631.29** |
| August 2017 | G | $10,643.70 | $4,898.25 | **$5,745.45** |

| Monthly Operating Reports | Exhibit | Income | Expenses | **Disposable Income** |
|---|---|---|---|---|
| September 2017 | H | $2,706.16 | $4,389.25 | **-$1,683.09** |
| October 2017 | I | $8,026.61 | $6,212.08 | **$1,814.53** |
| November 2017 | J | $5,925.36 | $6,915.08 | **-$989.72** |
| December 2017 | K | $7,966.48 | $6,023.46 | **$1,943.02** |
| January 2018 | L | $18,308.03 | $13,182.82 | **$5,125.21** |
| February 2018 | M | $7,997.21 | $4,495.05 | **$3,502.16** |
| March 2018 | N | $19,578.04 | $11,011.27 | **$8,566.77** |
| April 2018 | O | $13,436.24 | $6,638.06 | **$6,798.18** |
| Average | | $9,434.79 | $6,762.34 | **$2,672.45** |

    ii.   Debtor's Expenses:

| Personal Expenses | | Business Expenses | |
|---|---|---|---|
| Mortgage | $1,342.59 | Vehicle | $300.00 |
| Home Maintenance | $300.00 | Cell Phone | $300.00 |
| Utilities | $935.00 | Entertainment | $500.00 |
| Food and Housekeeping | $1,000.00 | Accounting Services | $400.00 |
| Clothing | $150.00 | Dues/Licensing | $100.00 |
| Personal Care | $150.00 | | |
| Medical/Dental | $150.00 | | |
| Transportation | $300.00 | | |
| Entertainment | $250.00 | | |
| Charitable Contributions | $100.00 | | |
| Life Insurance | $60.00 | | |
| Vehicle Insurance | $300.00 | | |
| **Total:** | $5,037.59 | **Total:** | $1,600.00 |

    32.    The Debtor and Ms. Arreola both contribute to household expenses, though the Debtor and Ms. Arreola provided inconsistent testimony regarding how these expenses are divided between them. (Trial Tr. 78:18-23, 180:14-181:16).

33. The Debtor admitted that during the pendency of his bankruptcy, he paid some of Ms. Arreola's personal expenses from his debtor-in-possession account. (Trial. Tr. 80:23-25, 81:8-13, 82:1-6, 83:13-15).

34. The Debtor's monthly operating reports show that the Debtor made various cash withdrawals between the Petition Date and the Trial Date. The monthly operating reports do not disclose the use of the cash withdrawals. (Trial Tr. 84:1-85:1).

E. Confirmation Proceedings

35. On January 17, 2018, the Debtor filed his Plan, which proposes as follows:

| Class | Creditor(s) | Secured / Unsecured | Approximate Amount of Claim | Treatment | Monthly Plan Payment Amount | Retain Lien? |
|---|---|---|---|---|---|---|
| N/A | Administrative Claims | Unsecured | Unknown | Paid in full on Effective Date unless otherwise agreed upon. | N/A | N/A |
| N/A | AZDOR | Unsecured priority tax claim | $10,325.99 | Paid in 54 equal monthly installments with 4% interest. | $209.27[3] | N/A |
| N/A | IRS | Unsecured priority tax claim | $53,350.81 | Paid in 54 equal monthly installments with interest at rate set forth in I.R.C. §§ 6621 and 6622. | $1,081.20 | N/A |

---

[3] Though the Plan provides for monthly payments in the amount of $209.27, pursuant to the *Stipulation for Plan Treatment Re: Arizona Department of Revenue* (Dkt. 85), which was approved by the Court, the Arizona Department of Revenue's priority claim is to be paid in equal monthly installments of $213.00.

| Class | Creditor(s) | Secured / Unsecured | Approximate Amount of Claim | Treatment | Monthly Plan Payment Amount | Retain Lien? |
|---|---|---|---|---|---|---|
| 1 | TD Auto Finance LLC | Secured by 2014 Jeep Wrangler | $16,223.13 | Amortized over 5 years, with interest to accrue at 4%. | $298.77 | Yes |
| 2 | Bank of New York Mellon and Select Portfolio Servicing, Inc. | Secured by Debtor's principal residence | $155,595.49 | Debtor will continue to make payments in accordance with the underlying loan documents. | N/A | Yes |
| 3 | IRS | Secured | $74,610.14 | Paid in 54 equal monthly installments with interest at rate set forth in I.R.C. §§ 6621 and 6622. | $1,512.04 | Not specified |
| 4 | General Unsecured Creditors | Unsecured | Not estimated in Plan; $309,771.35 based on scheduled debts and claims filed. | Holders of Class 4 claims will receive a pro rata share of $20,467.44 over 5 years, plus a pro rata share of a $10,000 new value contribution. | N/A; payments made in 5 annual payments in the approximate amount of $4,094.[4] | N/A |
| | Interest of Debtor | N/A | | Property of the estate will vest in the Debtor upon confirmation. | N/A | N/A |

---

[4] The Plan proposes a new value infusion in the amount of $10,000 to be divided pro rata among Class 4 claimants. However, the Plan anticipates that this new value infusion will be provided by Ms. Arreola. *See infra* p. 10.

36.     The Debtor proposes to fund his Plan using post-confirmation income. (TE C at 16).

37.     The Debtor testified that he believes he has deposited amounts sufficient to pay all administrative claims on the Effective Date, or as otherwise agreed. (TE R at ¶ 21).

38.     The Debtor further testified that he proposed his Plan in good faith, to employ the relief provided by the Code. (TE R at ¶ 25).

39.     Ms. Arreola has pledged to contribute the $10,000 new value contribution for the benefit of general unsecured creditors. (Trial Tr. 158:3-6; TE S at ¶ 6). The Plan provides that this contribution will be made in year three; however, Ms. Arreola testified that she would make such contribution before year three, if she could save the money. (Trial Tr. 158:3-6; TE S at ¶ 6). If this funding source fails, the Debtor has pledged to sell his residence, in which he estimates he has approximately $140,000 of exempt equity, in order to make the proposed new value contribution. (TE R at ¶ 45).

40.     Under the terms of the Plan, as proposed, the Debtor would need to make plan payments in the approximate amount of $3,446.18 per month.

41.     On March 8, 2018, the Creditors filed their Objection. The Objection asserts that the Plan fails to satisfy the requirements of 11 U.S.C. §§ 1129(a)(2), (a)(3), (a)(7)(A), (a)(8), (a)(10), (a)(11), (a)(15), and (b), and therefore cannot be confirmed.

42.     On March 12, 2018, the Debtor filed his *Ballot Report* (TE D). Such report indicates that the Debtor received votes from Class 1 (TD Auto Finance LLC), which accepted the Plan, and Class 4 (General Unsecured), which rejected the Plan.[5]

43.     On May 24, 2018, the parties presented oral arguments on the Creditors' Code § 1129(a)(2) objection, in which they argued that the Debtor had not complied with the Code because he did not include Ms. Arreola's income and assets on his schedules. For the reasons set forth in its ruling on the record, the Court did not find the Creditors' positions persuasive. The Court overruled the Creditors' objection to the Plan pursuant to § 1129(a)(2).

[5] The Debtor received three Class 4 ballots that voted to accept the Plan. However, the Creditors' vote rejecting the Plan left the Debtor with less than the two-thirds in amount required for class acceptance. § 1126(c).

44.     On May 25, 2018, the parties filed their Joint Pretrial Statement, according to which the Creditors' Code §§ 1129(a)(3), (a)(11), (a)(15), and (b) objections remain outstanding.[6]

## III.     Discussion and Legal Analysis

The requirements for confirmation of a plan in a Chapter 11 case are set forth in 11 U.S.C. §§ 1129(a)(1) – (16). If all of the requirements in § 1129(a) are satisfied with the exception of § 1129(a)(8), a plan can nevertheless be confirmed if it satisfies § 1129(b). The plan proponent bears the burden of proof to establish that the plan satisfies the confirmation requirements. *In re Perez*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994); *In re Arnold & Baker Farms*, 177 B.R. 648, 654-55 (B.A.P. 9th Cir. 1994), *aff'd,* 85 F.3d 1415 (9th Cir. 1996) (applying the preponderance of the evidence standard).

The Debtor argues that he has met all of the requirements necessary for confirmation of his Plan. The Creditors disagree.

### A.     11 U.S.C. § 1129(a)(3)

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." The Code does not define good faith; however, "[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002). Good faith is a factual "totality of the circumstances" determination. *Id.* at 1074-75; *see also In re Bashas' Inc.*, 437 B.R. 874, 910 (Bankr. D. Ariz. 2010). "[T]he fact that a debtor proposes a plan in which [he] avails [him]self of an applicable Code provision does not constitute evidence of bad faith." *In re Sylmar Plaza, L.P.*, 314 F.3d at 1075 (quoting *In re PPI Enters., Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998)).

/ / /

/ / /

---

[6] The Creditors had also objected to confirmation under §§ 1129(a)(7)(A), (a)(8), and (a)(10) in their Objection. The Debtor has acknowledged that he has not satisfied § 1129(a)(8) and must therefore satisfy § 1129(b). Because the only grounds for objection raised in the parties' joint pre-trial statement were raised pursuant to §§ 1129(a)(3), (a)(11), (a)(15), and (b), and these were the only issues raised at trial, the Court deems the Creditors' §§ 1129(a)(7)(A) and (a)(10) objections waived.

Furthermore, "[g]enerally, a plan is not filed in good faith if it represents an attempt 'to unreasonably deter and harass creditors' and to 'achieve objectives outside the legitimate scope of the bankruptcy laws.'" *In re Marshall*, 721 F.3d 1032, 1047 (9th Cir. 2013) (quoting *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)).

The debtor, as plan proponent, bears the burden of showing that his plan has been proposed in good faith. *In re Deed & Note Traders, LLC*, No. BAP AZ-11-1091-PADJU, 2012 WL 1191891, at *10 (B.A.P. 9th Cir. Apr. 5, 2012). The Debtor testified that he proposed his Plan in good faith, to employ the relief provided by the Code. According to the Debtor, he filed his Petition to address tax liabilities that arose when he learned that he had been improperly filing joint tax returns with Ms. Arreola on the advice of an accountant, and to address costly state court litigation that had been commenced against him by the Creditors. Neither of these reasons is improper on its face.

The Creditors argue that the Plan was not proposed in good faith, in short, because the Debtor: (1) failed to report assets, properly value assets and list pre-petition commissions on his schedules; (2) failed to supply proper monthly operating reports; (3) has subverted the spirit of § 541 by illicitly using UBLA to avoid the Court's supervision; and (4) is in effect funding Ms. Arreola rather than paying unsecured creditors.

The Court will address each of the Creditors' bad faith assertions in turn.

i.  Failure to Schedule and Properly Value Assets

The Creditors assert that the Debtor failed to schedule certain assets, including a car and commissions earned pre-petition. Although the Debtor failed to list a vehicle in which he has a legal interest, the Debtor does not maintain the insurance on or drive such vehicle, and he testified that his failure to schedule the vehicle was inadvertent. With respect to the Debtor's interest in open escrows as of the Petition Date, although the commissions from such escrows were not reported as accounts receivable, the Debtor deposited all post-petition commissions into his debtor-in-possession account, so they were effectively reported. The Creditors further allege that the Debtor's interest in a boat was undervalued. Other than the fact that the liability coverage on

the boat exceeded the value, there was no evidence to controvert the Debtor's statement of value.

### ii.    Failure to Supply Proper Monthly Operating Reports

The Debtor has filed all monthly operating reports and supplemented his monthly operating reports with complete bank statements. He testified that his failure to disclose what he did with his cash withdrawals was inadvertent. There was no evidence presented that the use of the cash was in bad faith.

### iii.    Interest in UBLA

The Creditors allege that the Debtor formed UBLA, transferred the Vacant Lot into UBLA and used the UBLA bank account to avoid bankruptcy court supervision. While the Debtor appears to have had some interest in the Vacant Lot pre-petition, it is unclear what that interest was, other than being referred to as a "hand-shake" interest. Further, no testimony was presented to show that UBLA was not properly formed, funded, or operated. This is neither an action to pierce the corporate veil nor to find a fraudulent transfer; rather, it is raised in the context of a lack of good faith in proposing the Plan. The facts do establish that:  1) the Vacant Lot was deeded to UBLA by third parties; (2) the Debtor disclosed his 90% membership interest in UBLA on his schedules; (3) the Debtor amended his schedules to reflect an increase in the value of his membership interest; and (4) the Debtor deposited the $10,000 distribution he received from UBLA into his debtor-in-possession account.

### iv.    Funding of Ms. Arreola

The Debtor does not contest that approximately $72,425 was transferred from the Debtor's and Ms. Arreola's joint account to Ms. Arreola's personal accounts during the twenty-two months prior to the Petition Date. The testimony submitted at trial was that these transfers represented amounts Ms. Arreola earned during employment at Realty Executives McConnaughay and in her capacity as an independent real estate broker. The Creditors did not refute this testimony.

Further, this conduct is not inconsistent with the fact that the Debtor and Ms. Arreola had established a household together, shared expenses, and generally conducted themselves as if married. The fact that they are not married and that their conduct has resulted in, and may result in, additional adverse tax consequences does not reflect bad faith in proposing the Plan. Though the Debtor should not have paid any of Ms. Arreola's personal expenses from his debtor-in-possession account, no evidence was presented to show that the Debtor made such payments in bad faith. The issue of the payments will be dealt with further, later in this decision.

The Court acknowledges that the relationship between the Debtor and Ms. Arreola, both personal and business, and the pre-petition commingling of their finances makes the analysis under 11 U.S.C. §1129(a)(3) more difficult. Looking at the totality of the facts and evidence presented in this matter, however, the Court finds and determines that the Plan was proposed in good faith. The Creditors Objection under § 1129(a)(3) is therefore overruled.

**B.      11 U.S.C. § 1129(a)(11)**

The Creditors also objected to confirmation of the Plan on the basis that the Plan is not feasible.

Section 1129(a)(11) requires that a plan be feasible in order to be confirmed. A plan of reorganization is feasible if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor[.]" 11 U.S.C. § 1129(a)(11). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11] at 1129–34 (15th ed. 1984)).

"The mere potential for failure of the plan is insufficient to disprove feasibility." *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994). That being said, every debtor is required to present "ample evidence to demonstrate that the [p]lan has a reasonable probability of success." *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986).

It is unknown what the amount of allowed administrative claims in this case will be, but

the Debtor testified that he believes he has sufficient funds on hand to pay all administrative claims on the Effective Date, or as otherwise agreed. The Creditors have not presented any evidence to the contrary.

The Debtor's Plan proposes monthly payments to priority and secured claimants in the aggregate amount of $3,105.01, plus annual payments of approximately $4,094.00 to general unsecured creditors. Thus, the Debtor needs funds in the approximate amount of $3,446.18 per month to make his proposed plan payments.

The Debtor intends to fund his Plan using post-confirmation earnings. In the eleven-month period between the Petition Date and the Trial Date, the Debtor's monthly operating reports reveal that although his income fluctuates due to his employment as a real estate agent, he generally generates sufficient income to make his proposed plan payments. Additionally, the balance in the Debtor's debtor-in-possession account has increased steadily during the pendency of this case. The September 2018 monthly operating report reflects an ending cash balance of $26,165.84. There was no evidence presented to indicate that there is any threat to the Debtor's employment or earning capacity; in fact, the testimony contemplated a rise in market values for Yuma properties.

Based upon the totality of the evidence the Court finds and concludes that so long as the Debtor has the necessary cash to make all payments required on the Effective Date, the Debtor has demonstrated that the Plan has a reasonable probability of success and that this reorganization is unlikely to be followed by liquidation or additional reorganization. So long as the requirement for Effective Date payments is met, the Plan would meet the requirements of feasibility under § 1129(a)(11), and the Creditors' § 1129(a)(11) objection overruled.

## C.    11 U.S.C. § 1129(a)(15)

Pursuant to § 1129(a)(15), in an individual Chapter 11 case, if the holder of an allowed unsecured claim objects to confirmation, either the plan must provide to pay the claim in full or the value of the property to be distributed under the plan must not be less than the debtor's projected disposable income (as defined in § 1325(b)(2)) over the 5-year period of the plan, or

during the period for which the plan provides payments, whichever is longer.

"Projected disposable income" is defined in § 1325(b)(2) as:

> [C]urrent monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—
> (A) (i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
> (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Generally, "current monthly income" is calculated by averaging the debtor's monthly income for the six-month period preceding the bankruptcy filing. *Hamilton v. Lanning*, 560 U.S. 505, 510, 130 S. Ct. 2464, 2470, 177 L. Ed. 2d 23 (2010); *see also* § 101(10A). However, "the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Lanning*, 560 U.S. at 524, 130 S. Ct. at 2478.

The Debtor changed employment approximately four months before the Petition Date. The Debtor admitted that the income and expenses reflected in the budget and pro forma projections attached as Exhibits B and C to his Disclosure Statement are inflated and therefore inaccurate, because they were calculated based on the income he earned and the expenses he incurred while working at his previous place of employment.

As part of his post-trial brief, the Debtor filed updated expense and income charts, which were based on the monthly operating reports the Debtor filed between the Petition Date and the Trial Date. The Debtor has conceded however that he regularly paid some of Ms. Arreola's

expenses from his debtor-in-possession account during this period. Further, despite listing Ms. Arreola as a dependent on his schedules, both the Debtor's and Ms. Arreola's testimony revealed that both pre- and post-petition, Ms. Arreola has had a steady stream of income. While at Realty Executives McConnaughay, Ms. Arreola's commissions were made payable to the Debtor so that Ms. Arreola could avoid paying a surcharge to Realty Executives McConnaughay. Upon the Debtor's receipt of such commissions, Ms. Arreola transferred the majority of her commissions from the couple's joint account to her own personal account. In the four months prior to the Petition Date, the evidence reflects that Ms. Arreola was paid directly by Realty Executives, in an amount primarily determined by the Debtor, as the team leader.

Accordingly, for purposes of this analysis, Ms. Arreola is not a dependent of the Debtor. Therefore, Ms. Arreola's expenses do not qualify as expenses reasonably necessary to be expended for purposes of the projected disposable income calculation, and cannot be used to reduce the amount that the Debtor is required to commit to his Plan pursuant to § 1129(a)(15).

In this case, given the Debtor's control over the distribution of commissions, the extreme fluctuations in his actual versus projected expenses, and his payment of certain of Ms. Arreola's expenses, as well as what appears to be the majority of the monthly living expenses, the Court finds it useful to review the Debtor's expenses in comparison to the National and Local Standards as set forth by the Internal Revenue Service for use in completing bankruptcy forms, as adopted by the Office of the United States Trustee. *See In re Bennett*, No. 07-10864-SSM, 2008 WL 1869308, at *2 n.6 (Bankr. E.D. Va. Apr. 23, 2008). The allowed monthly expenses for a household of one, for cases filed between May 1, 2017 and October 31, 2017, are as follows:

/ / /

/ / /

| Standard Expense | Standard Expense Amount | Debtor's Expense Amount | Amount in Excess of Allowed Standard Expenses |
|---|---|---|---|
| Local Standard (Yuma County) Housing and Utilities, Mortgage Expenses | $695.00 | $1,342.59 | $647.59 |
| Local Standard (Yuma County) Housing and Utilities, Non-Mortgage Expenses | $480.00 | $1,235.00 | $755.00 |
| National Standard - Food | $345.00 | $850.00[7] | $505.00 |
| National Standard - Housekeeping Supplies | $32.00 | $150.00[8] | $118.00 |
| National Standard - Apparel & Services | $83.00 | $150.00 | $67.00 |
| National Standard - Personal Care Products & Services | $36.00 | $150.00 | $114.00 |
| National Standard – Miscellaneous[9] | $143.00 | $143.00 | $0.00 |
| National Standard – Out-of-Pocket Health Care Expenses (Under 65) | $49.00 | $150.00 | $101.00 |
| Local Transportation Expense (National - Ownership Costs) | $485.00 | $300.00 | (+$185.00) |
| | **Amount in Excess of Allowed Standard Expenses (Minimum Total):** | | **$2,122.59** |

*See Means Testing*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/ust/means-testing/20170501 (last updated Oct. 16, 2017).

A comparison of these allowed expenses to the Debtor's personal expenses, as set forth in the above chart, reflects that the Debtor's projected expenses exceed allowed expenses by approximately $2,100.00. In addition, it appears that the Debtor has duplicate expenses, for transportation/vehicle, in the amount of $300 in both his personal and business expenses.

---

[7] Debtor combines "Food" and "Housekeeping Supplies" into one expense, for a total of $1,000. This amount has been separated into "Food - $850" and "Housekeeping Supplies - $150" for ease.
[8] See *supra* fn. 7.
[9] "Miscellaneous" expense may be used for expenses not included in other categories, or to cover overages in other categories that are not covered by deviations. In this case, the miscellaneous amount is used for Debtor's additional expenses not included in other categories.

Assuming all other expenses are reasonable, the Debtor's monthly expenses exceed the National and Local Standard expense allowances by approximately $2,400.00.

Based on the foregoing and the totality of the evidence, the Court finds and concludes that the Debtor has not demonstrated that the distributions under the Plan are not less than the Debtor's projected disposable income as required by § 1129(a)(15). The Creditors' § 1129(a)(15) objection is therefore sustained.

### D.    11 U.S.C. § 1129(b)

Section 1129(b)(1) of the Code provides that if all applicable provisions of § 1129(a) are met with the exception of § 1129(a)(8), the Court shall confirm a plan so long as it does not discriminate unfairly and is fair and equitable with respect to the objecting class. There are no assertions that the Plan discriminates unfairly, so the Court need only determine whether the Plan is fair and equitable. "Whether a plan is fair and equitable is a factual determination[.]" *In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 646 (9th Cir. 2017), *as amended* (June 23, 2017), *cert. denied sub nom. First S. Nat. Bank v. Sunnyslope Hous. Ltd. P'ship*, 138 S. Ct. 648, 199 L. Ed. 2d 530 (2018).

Pursuant to § 1129(b)(2)(B), a plan is fair and equitable with respect to a class of unsecured claims if:

> (i)    the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of (a)(14) of this section.

Section 1129(b)(2)(B)(ii), which is commonly known as the absolute priority rule, applies to individual Chapter 11 cases post-BAPCPA. *See Zachary v. Cal. Bank & Trust*, 811 F.3d 1191

(9th Cir. 2016). The Ninth Circuit has recognized an exception to the absolute priority rule, which is often referred to as the new value exception. *In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890*, 265 F.3d 869, 873 (9th Cir. 2001).

"To satisfy the new value exception to the absolute priority rule, and to satisfy § 1129(b)(2)(B)(ii) notwithstanding the objection by an unsecured class that is not paid in full, former equity owners are 'required to offer value that [is] 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received.'" *In re Dunlap Oil Co., Inc.*, No. BAP AZ-14-1172-JUKID, 2014 WL 6883069, at *21 (B.A.P. 9th Cir. Dec. 5, 2014) (quoting *In re Bonner Mall P'ship*, 2 F.3d 899, 908 (9th Cir. 1993)). "Recognizing that the new value corollary was initially developed with the corporate debtor in mind, bankruptcy courts have observed that its application in individual chapter 11 cases is difficult and have concluded that the exception should be narrowly construed." *In re Hamilton*, No. 3:14-BK-3142-C-11, 2018 WL 3637905, at *10 (B.A.P. 9th Cir. July 31, 2018).

In this case, the Debtor proposes to satisfy the absolute priority rule by contributing $10,000 of new value to the general unsecured class from either non-estate property contributed by Ms. Arreola or, if that funding source becomes unavailable, from exempt homestead proceeds. In his Plan, the Debtor proposes to make this proposed new value contribution in year three of the Plan.

The proposed $10,000 contribution is "new" given that the Debtor would not otherwise be obligated to make this contribution, and given that the contribution will be funded from an outside source or the Debtor's exempt property. Provided the new value contribution is made on the Effective Date, the proposed new value contribution would also clearly be "money or money's worth" given that the proposed contribution is a cash contribution. Given that the contribution is not to be made until year three and the testimony reflects that Ms. Arreola did not have the funds as of the trial date, this condition has not been met. The proposed $10,000 contribution is "reasonably equivalent to the value or interest received" given that all of the Debtor's non-exempt assets are encumbered by a federal tax lien; thus, the Debtor would be

retaining encumbered assets in exchange for a $10,000 contribution. Lastly, the proposed contribution is necessary for the Debtor's successful reorganization given that not all classes have voted to accept the Plan, and the Debtor cannot therefore confirm his Plan and embark on a reorganization unless he can satisfy the absolute priority rule or new value exception.

The final analysis is whether the proposed contribution is substantial. "The Ninth Circuit has declined to specifically adopt a particular methodology for determining whether a contribution is substantial, holding instead that a 'de minimis contribution' does not satisfy the new value exception." *In re Dunlap Oil Co., Inc.*, 2014 WL 6883069, at \*21. The facts and circumstances of a case inform a court's decision as to whether a proposed contribution is *de minimis. See, e.g. In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) (finding a contribution representing less than 0.5% of the total unsecured debt in the case to be *de minimis* given that no dividend would be paid on secured claims as a result of the contribution and given the disparity between the total unsecured debt and contribution); *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) (upholding a lower court's determination that a contribution representing 3.8% of the $2.6 million of unsecured debt in the case was an insubstantial "token cash infusion" and not a fair price for the right to participate in the reorganized debtor); *In re RTJJ, Inc.*, No. 11-32050, 2013 WL 462003, at \*13 (Bankr. W.D.N.C. Feb. 6, 2013) (finding a contribution representing 2% of the general unsecured debt in the case to be sufficient where the debtor was a small family business with no unencumbered assets); *In re Elmwood, Inc.*, 182 B.R. 845, 853 (D. Nev. 1995) (finding a cash contribution representing less than 4% of the general unsecured dischargeable debt to be substantial considering the location and condition of the debtor's primary asset).

The Ninth Circuit has recognized that when determining whether a new value contribution is substantial, it may be relevant to: (1) compare the amount of the contribution to the total unsecured claims; (2) compare the amount of the contribution to the amount of claims being discharged; and (3) consider how much of the dividend being paid on unsecured claims would come from the contribution. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655; *see also In re Dunlap Oil Co., Inc.*, 2014 WL 6883069, at \*21.

The general unsecured claims in this case, as modified by filed claims, total approximately $309,771.35, the majority of which is potentially dischargeable. The proposed $10,000 new value contribution only represents approximately 3.2% of the total general unsecured debt in this case. Though the proposed new value contribution represents approximately 32.8% of the funds that would be distributed to general unsecured creditors through the Plan, as proposed, general unsecured creditors would only receive approximately 10 cents on the dollar. In this case, to pass the *de minimis* test, the Court finds that a contribution would have to equal at least 5% of the total unsecured debt.

Given the amount of unsecured debt in this case, and the timing of the contribution, the Court finds and concludes that the $10,000 proposed new value contribution is not substantial, nor money or money's worth, and therefore does not satisfy the new value exception to the absolute priority rule. The Creditors' § 1129(b) objection is therefore sustained.

**IV.    Conclusion**

For the reasons stated above and the totality of the evidence presented in this case, the Court finds and concludes that the Debtor has failed to meet his burden of establishing that the Plan satisfies the provisions of Code §§ 1129(a)(15) and (b).

Wherefore, based upon the foregoing and for good cause shown;

**IT IS ORDERED** that the Creditors' Objection is sustained in part and overruled in part.

**IT IS FURTHER ORDERED** that confirmation of the Plan is denied. The Debtor is granted thirty (30) days from entry of this order to file an amended plan to rectify the deficiencies discussed in this ruling. If an amended plan is not timely filed, the court will consider dismissal or conversion of this case.

**DATED AND SIGNED ABOVE.**